IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DARLENE A. JOHNSON, | ) | CASE NO. 1:17-cv-01778 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Darlene A. Johnson ("Plaintiff" or "Johnson") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits. Doc. 1. This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 14. For the reasons explained herein, the

Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

On May 24, 2010, Johnson filed applications for disability insurance benefits ("DIB")

and supplemental security income ("SSI"). Tr. 407-418, 1214. Johnson alleged a disability

onset date of May 15, 2007. Tr. 407, 414, 481, 1214. She alleged disability due to bipolar

disorder, depression, and sleep apnea. Tr. 229, 239, 486. After initial denial by the state agency

(Tr. 229-235) and denial upon reconsideration (Tr. 239-252), Johnson requested a hearing (Tr.

253-254). On March 16, 2012, a hearing was held before Administrative Law Judge Valencia

Jarvis ("ALJ Jarvis"). Tr. 12-74. On July 26, 2012, ALJ Jarvis issued an unfavorable decision,

(Tr. 177-195), finding that Johnson had not been under a disability within the meaning of the

Social Security Act from May 15, 2007, through the date of the decision (Tr. 190). Johnson requested review of the ALJ's decision by the Appeals Council, and the Appeals Council remanded the matter on October 15, 2013, for allowance of a supplemental hearing and for further evaluation of Johnson's impairment of obesity. Tr. 196-201, 296-301.

Following the remand, a hearing was held on May 7, 2014, before Administrative Law Judge Susan Giuffre ("ALJ Giuffre" or "ALJ"). 75-91. A supplemental hearing was also held before ALJ Giuffre on August 22, 2014. Tr. 92-140. On October 10, 2014, ALJ Giuffre issued a decision denying Johnson benefits. Tr. 202-223. On December 10, 2014, Johnson requested review of the October 10, 2014, decision. Tr. 362-368. On March 24, 2016, the Appeals Council remanded the matter again for further evaluation of Johnson's obesity; further consideration of Johnson's RFC during the entire period at issue; evaluation of the opinion of treating source Dr. Haglund; and if warranted, obtaining supplement vocational expert testimony. Tr. 224-228.

On November 30, 2016, ALJ Giuffre held a hearing. Tr. 141-172. On December 29, 2016, ALJ Giuffre issued a decision (Tr. 1221-1235), finding that Johnson had not been under a disability from May 15, 2007, through the date of the decision (Tr. 1227). On March 2, 2017, Johnson requested review of the ALJ's decision. Tr. 405-406, 578-581. On June 26, 2017, the Appeals Council denied Johnson's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1206-1210.

## II. Evidence

### A.      Personal, vocational and educational evidence

Johnson was born in 1963. Tr. 407, 1225-1226. At the time of the November 2016 hearing, Johnson was living by herself in an apartment provided through the Nord Center,

Shelter Plus Care Program. Tr. 149-150. Johnson graduated from high school, attending regular classes. Tr. 145. Johnson attended classes in the field of food management and attended a nursing program at a community college but did not complete the clinical portion of the program. Tr. 145. She attended an eight-month night school program to become a dialysis technician. Tr. 145-146. In 2003, Johnson obtained a diploma for completing that program. Tr. 146. She last worked as a dialysis technician in 2008. Tr. 146-149. Johnson stopped working in 2008 because she was sick – her medical providers were struggling to get the right medications to manage thyroid related medical problems. Tr. 147. Also, at the time she stopped working, she was doing dialysis technician work through a temporary agency and the work she was getting was not keeping her busy enough to pay her bills. Tr. 147. Prior to working through the temporary agency, Johnson had worked at Renal Care Group as a dialysis technician until 2007. Tr. 146. She was terminated from Renal Care Group following a disagreement regarding the amount of wages Johnson thought she should be making. Tr. 146, 149.

**B.     Medical evidence – mental impairments**

  **1.     Treatment history**

  In March 2010, Johnson sought treatment on her own at the Nord Center. Tr. 582-596. Johnson reported that she was getting "really, really depressed." Tr. 582. She did not want to get out of bed and was always crying. Tr. 582. She did not want to go anywhere or do anything. Tr. 582. Johnson had lived in Georgia for about 6 years and had moved to Ohio about 1 ½ years prior. Tr. 582. She had recently gotten married but was having marital problems. Tr. 582. Johnson was unemployed. Tr. 582. Johnson was not certain how to update her dialysis technician license to comply with Ohio's requirement and was unable to obtain employment in that field. Tr. 582. She felt trapped. Tr. 582. Johnson reported six years of sobriety and was

concerned that she would soon give into her impulses to use again. Tr. 582. She felt she needed

help coping with her stress. Tr. 582. Johnson indicated that her mother and brothers provided

support when needed. Tr. 583. She had gained 37 pounds in about six to eight months. Tr. 587.

She was always angry about something. Tr. 587, 588. Johnson had difficulty maintaining focus

on any one thing at a time. Tr. 588. She had been having sleep problems and taking sleep aids.

Tr. 588. Johnson reported that her activities of daily living were good; she reported no suicidal

or homicidal ideation, plan or intent and no hallucinations. Tr. 590. No psychosis was observed.

Tr. 590. Johnson's affect was "full, sullen at times" and her mood was congruent. Tr. 590. Her

thoughts were clear and organized with her thought content centered around hopelessness. Tr.

590. Johnson's current stressors included marital discord, unemployment and lack of insurance.

Tr. 590. Johnson was diagnosed with depressive disorder, NOS, rule out major depression and

cocaine dependence, in sustained full remission. Tr. 591. She was assessed a GAF of 60.[1] Tr.

591. Johnson was referred for counseling with psychologist Thomas Haglund, Ph.D. Tr. 604.

Johnson's first appointment with Dr. Haglund was scheduled for March 17, 2010, but

Johnson cancelled that appointment. Tr. 603. Her first session with Dr. Haglund was on March

23, 2010. Tr. 602. During the March 23, 2010, session, Dr. Haglund noted that Johnson

presented with depressive symptoms related to marital problems, unemployment and feeling held

back because of her criminal record. Tr. 602. Johnson relayed being sober for eight years but

having urges to use. Tr. 602. She had other health problems, including hypertension, acid

---

[1] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

reflux, and removal of her thyroid. Tr. 602. She and her husband fought frequently. Tr. 602. Johnson was interested in trying to work as a dialysis technician but was worried that her criminal record would surface. Tr. 602. Dr. Haglund observed that Johnson's mood/affect was depressed and tearful; she was alert and oriented; and her behavior/functioning was adequate. Tr. 602. Johnson failed to show for an appointment with Dr. Haglund on April 8, 2010. Tr. 601.

On May 19, 2010, psychiatrist Praveen Abraham, D.O, of the Nord Center, completed a psychiatric evaluation. Tr. 597, 721-722. Johnson reported panic-like and depressive symptoms. Tr. 721. On mental status examination, Johnson was pleasant and cooperative; her affect was stable; there was no psychosis; her speech was plentiful but non-pressured; her thoughts were logical, goal directed and abstract; she had no homicidal or suicidal ideation; her insight and judgment were fair to good; there were no cognitive deficits; she was oriented and alert; and she appeared engaged and motivated for treatment. Tr. 721. Dr. Abraham diagnosed bipolar disorder, type II and cocaine dependence in sustained full remission. Tr. 722. Dr. Abraham started Johnson on Lamictal for her bipolar, depressed symptoms and recommended follow up in six weeks. Tr. 597, 722.

Johnson failed to keep an appointment with Dr. Haglund on May 28, 2010. Tr. 780. Johnson saw Dr. Abraham for medication management on July 9, 2010. Tr. 705-706. She saw Dr. Haglund on August 31, 2010. Tr. 703-704. Dr. Haglund observed that Johnson's mood/affect had improved. Tr. 703. She was alert and oriented and her behavior/functioning was adequate. Tr. 703. Johnson relayed that she felt better with medication but was still dealing with a lot of marital stress. Tr. 703. She was upset too because her dog had been stolen and she missed her dog a lot. Tr. 703. Johnson agreed to meet with Dr. Haglund more often to talk

about her issues. Tr. 703. She also indicated she had some concerns about her weight, blood pressure, and thyroid. Tr. 703.

Johnson saw Dr. Abraham for medication management on September 7, 2010. Tr. 701-702. Dr. Abraham's notes reflect that Johnson had been doing well; her depression was well controlled; she was euthymic, calm and cooperative; and she was happy to be seeing Dr. Haglund. Tr. 701. Johnson did report some medication side effects, including nausea, but relayed that the side effects were tolerable because they had been subsiding. Tr. 701. Johnson saw Dr. Haglund on September 21, 2010. Tr. 699-700. Johnson was depressed and tearful. Tr. 699. She relayed problems that she was having with her husband. Tr. 699. She expressed a desire to leave her husband but indicated she felt "stuck." Tr. 699. Dr. Haglund discussed suggestions on how to cope with the concerns that Johnson had regarding her marriage. Tr. 699. Johnson saw Dr. Haglund again on October 7, 2010. Tr. 697-698. Johnson continued to relay problems in her marriage and discussed her desire to try to leave but she was not certain how to do so. Tr. 697. Dr. Haglund indicated that Johnson was still taking Lamictal but noted that, under the circumstances, it was hard to determine whether it was effective. Tr. 697. During a subsequent visit with Dr. Haglund on December 1, 2010, Johnson was depressed, exhibited negative thinking, and was withdrawn and unmotivated. Tr. 693. Johnson explained she had left her husband a few weeks prior and was homeless. Tr. 693. She was staying "here and there" with friends. Tr. 693. Her family was not aware of her situation and she did not want them to know about it. Tr. 693. She was feeling very anxious and depressed. Tr. 693. On December 20, 2010, Johnson saw Dominic Gomes, M.D., for medication management. Tr. 690-691. Johnson was not doing well. Tr. 690. Dr. Gomes prescribed Celexa, Trazodone and Ativan. Tr. 690-691. He discontinued Lamictal. Tr. 691.

Johnson saw Dr. Gomes again for medication management on January 11, 2011.  Tr. 688-689.  Johnson's stressors included being homeless.  Tr. 688.  Dr. Gomes observed that Johnson's mood/affect were within normal limits as was her thought process/orientation and she was cooperative.  Tr. 688.  Some medication adjustments were made.  Tr. 688.  Dr. Gomes encouraged Johnson to attend AA/NA meetings, attend individual counseling, and follow up at the free clinic for sleep apnea.  Tr. 688.  The following month Johnson saw Dr. Gomes.  Tr. 686-687.  She presented with depression, anxiety and anger and was initially irritable.  Tr. 686.  Stressors included unemployment and financial difficulties.  Tr. 686.  She was looking for a job but also noted that she wanted SSI.  Tr. 686.  She did not have a car.  Tr. 686.  Johnson was not taking her Trazodone because she was afraid she would pass out.  Tr. 686.  She was not interested in changing her medication.  Tr. 686.

On March 16, 2011, Johnson saw Dr. Haglund as a walk-in appointment.  Tr. 777-778.  She was in the building that day to see Dr. Gomes but had the wrong day so she requested to see Dr. Haglund.  Tr. 777.  She reported doing better but was still depressed and she was having trouble functioning.  Tr. 777.  Johnson was still homeless and separated from her husband; she was living with a friend and helping out with her friend's kids.  Tr. 777.  Johnson relayed that she had recently been denied social security disability benefits again.  Tr. 777.  Dr. Haglund discussed with Johnson obstacles to working.  Tr. 777.  Johnson relayed that her mind did not "click" or work fast enough. Tr. 777.  She had trouble with concentration and would become anxious and overwhelmed in response to work stress.  Tr. 777.

Through the Nord Center an Individual Service Plan was completed on March 23, 2011.  Tr. 773-776.  In that plan, Johnson's symptoms were listed as depressed mood, irritability, poor

concentration, feeling helpless and hopeless, tearfulness, anxiety, and social withdrawal. Tr. 774.

Johnson saw both Dr. Gomes and Dr. Haglund on April 14, 2011. Tr. 769-770, 771-772. Johnson relayed that she was doing better. Tr. 769, 771. But she indicated she was still depressed and easily moved to tears, irritable, had poor concentration and memory and "bad thoughts." Tr. 771. She remained separated from her husband. Tr. 771. Johnson felt that her husband was on "good behavior" hoping that she would return home. Tr. 771. Johnson was spending time with her mom and brother. Tr. 771. She had thought about taking a minimum wage job but decided she could not do it. Tr. 771. She was recently denied social security benefits again. Tr. 771.

Johnson saw Dr. Haglund in July and August 2011. Tr. 763-764, 767-768. She was still depressed and dealing with stressors such as homelessness and marital problems. Tr. 763, 767. She was awaiting a decision from social security but she hoped to one day return to her career in dialysis. Tr. 767. On August 19, 2011, Johnson was admitted to Nord ESS/CSU because of increased depression, anxiety, her recent separation from her husband and some external stressors. Tr. 759-762, 795-799, 827. On August 26, 2011, a transition plan was completed. Tr. 759-762. Johnson planned to go to Genesis House where she planned to stay. Tr. 760. She reported receiving support from her mother and brothers as well as from the Nord Center (Dr. Haglund and Dr. Gomes). Tr. 760. Johnson felt good about the services and transition plan and her prognosis was good. Tr. 760.

In September 2011, Johnson saw Dr. Haglund (Tr. 789-790) and started receiving Community Psychiatric Supportive Treatment (CPST) therapy. Tr. 785-786, 787-788, 791-792, 793-794. Johnson was doing okay but reported some family and shelter related stressors. Tr.

785, 791.  She was working on getting additional time to stay at Genesis House while she sought alternative housing with the help of her case manager.  Tr. 785, 789, 793.  Throughout the remainder of 2011, Johnson continued to receive CPST services and she continued to see Dr. Gomes and Dr. Haglund.  Tr. 805-826.  When Johnson saw Dr. Haglund in December 2011, she relayed that a lot of good things had happened since her last session with him.  Tr. 807-808.  She had gotten her own apartment and she received donated furniture and a donated car.  Tr. 807.  Johnson was working on trying to get her license back and was hoping to get approval for bariatric surgery and to eventually get healthy enough to get back into her prior job as a dialysis technician.  Tr. 807.  During a December appointment with Dr. Gomes, she relayed that she had a beautiful apartment and had started to go to the YMCA; she planned to lose weight and wanted bariatric surgery.  Tr. 809.

On February 9, 2012, Johnson's CPST provider noted that Johnson denied any current crisis.  Tr. 801-802.  Johnson was adhering to her medication and was pursuing a disability appeal and finalizing her divorce.  Tr. 801.  She was feeling excited and relieved that the divorce would be over.  Tr. 801.  She had received a ticket for an expired license and indicated "it is what it is[,]" noting that she would have to pay the fine.  Tr. 801.  During visits with her CPST provider in March 2012, Johnson reported having no current concerns.  Tr. 857-862, 865-866.  Johnson saw Dr. Gomes for medication management in March 2012.  Tr. 863-864.  She relayed that her divorce had been finalized.  Tr. 863.  She was depressed and indicated she had no money to buy medications.  Tr. 863.  Johnson saw Dr. Haglund on April 10, 2012.  Tr. 867-868.  She reported being depressed and spending a lot of time sleeping.  Tr. 867.  She explained that her family had unrealistic expectations of her, expecting her to be able to function the way she used to and not understanding the struggle that she faced with her depression.  Tr. 867.  However, she

was grateful for the help she received in getting her own apartment and having nice things and she was hopeful about her social security case. Tr. 867. Also, she had been trying to get help to pay for her non-Nord medications. Tr. 867. In April 2012, Johnson also relayed to her CPST provider that she was having an increase in her depression and that she had been sleeping more often. Tr. 869-870.

On May 15, 2012, Johnson saw Dr. Haglund and reported being in outerspace/feeling like she was in a fog. Tr. 873-874. She had been off of her medication because of money issues but was back on them. Tr. 873. She was feeling low and down on herself and mostly keeping to herself and setting limits with her neighbors. Tr. 873. She was attending Genesis House aftercare meetings. Tr. 873. She had been cited twice for driving without a license but felt she had no option but to drive to go anywhere. Tr. 873. In September 2012, Johsnon saw Dr. Haglund. Tr. 885-886. She was not doing well. Tr. 885. She was isolating herself and felt that no one cared about her. Tr. 885. She was doing better until she was cited for driving without a license. Tr. 885. She decided to get rid of her car and had fines to pay. Tr. 885. Johnson felt she was unable to work because of her depression and bad attitude. Tr. 885.

Johnson continued to receive mental health treatment through various medical providers at the Nord Center throughout 2013 until at least 2016. Tr. 887-900 (2013 treatment notes), 966-986 (2014 treatment notes), 987-1012 (2015 treatment notes), 1013-1022, 1184-1191 (2016 treatment notes). Johnson was struggling with various issues throughout her continuing course of treatment, including caring for her ailing mother, legal problems, housing problems, and financial problems that were causing stress, depression and anxiety. *Id.* In April 2013, during a session with Dr. Haglund, Johnson relayed that she had slapped a neighbor who was bothering her. Tr. 889. There was no police involvement. Tr. 889. She was continuing to struggle with

lack of income and transportation. Tr. 889. In May 2013, Dr. Haglund informed Johnson that he was planning on retiring. Tr. 891. During that visit, Johnson relayed that she had received an extension on paying her court fines and her niece was moving in with her for a few months and would be contributing financially. Tr. 891. Johnson was continuing to see Dr. Gomes for medication management. Tr. 891. In July 2013, Johnson was doing fairly well. Tr. 897. She was continuing to struggle with transportation issues and finding money to cover her medications. Tr. 897. She was trying to use resources from the Free Clinic and Nord to help with her medications. Tr. 897.

In January 2014, Johnson was stable and medication was available. Tr. 966. In February 2014, Johnson reported being sad and was having a difficult time handling being her mother's primary caretaker with her brothers not providing support. Tr. 968. In April 2014, Johnson indicated that her mother was doing better, which had reduced her stress level. Tr. 972. In November 2014, Johnson was agitated, sad and frustrated due to legal issues and financial issues. Tr. 981. She relayed that she had been denied social security benefits again. Tr. 981.

In January 2015, Johnson relayed that she had a court appearance for shoplifting soap and deodorant from a dollar store. Tr. 987. Johnson was impulsive at times, which was creating legal issues for her. Tr. 987, 989. In June 2015, Johnson was continuing to be stressed, worried, and angered about her siblings regarding their thoughts about their mother and her ongoing care. Tr. 999.

During a June 2016 visit, Johnson relayed that she was seeing two men and continuing to try to work out at the YMCA. Tr. 1184. She was continuing to work towards having bariatric surgery. Tr. 1184. Johnson relayed that her mother was doing "well" but Johnson was still tearful when speaking of her mother. Tr. 1184. She wanted to continue with her current

medications. Tr. 1184. In August 2016, during a counseling session with Ms. Gina Petrella, Johnson was overwhelmed, tearful and reporting suicidal ideation. Tr. 1186. In October 2016, Johnson was "struggling." Tr. 1188. Her mother was not doing well. Tr. 1188. Johnson was getting some help from outside services and was interested in applying for medical marijuana. Tr. 1188.

### 2. Opinion evidence

#### a. Treating psychologist

Dr. Haglund completed three reports/forms regarding Johnson's mental impairments. Tr. 680-684 (February 2011), 756-757 (March 2011), 848-849 (July 2012).

*February 2011*

On February 9, 2011, Dr. Haglund completed a Mental Status Questionnaire and a Daily Activities Questionnaire. Tr. 680-684. Dr. Haglund described Johnson's mood and affect as depressed and tearful; her flow of conversation and speech was normal; she reported some panic-like symptoms; she had no psychotic symptoms; her orientation was intact; she had average intelligence and no significant problems with attention/concentration; and her insight and judgment were fair. Tr. 680. Dr. Haglund indicated that Johnson's diagnosis was bipolar disorder, type II for which she was taking Celexa, Trazodone, and Ativan. Tr. 681. Dr. Haglund answered questions regarding Johnson's ability to perform various functions, indicating that her ability to remember, understand and follow directions and maintain attention were "probably intact." Tr. 681. Her ability to sustain concentration, persist at tasks, and complete them in a timely fashion "may be impaired due to depression." Tr. 681. With respect to social interaction, Dr. Haglund indicated that Johnson was easily upset, angered, and irritable and she avoided social contact. Tr. 681. Dr. Haglund indicated that Johnson's ability to adapt was "probably

impaired due to depression, low motivation, [and] problems with interacting with people." Tr. 681. When asked how Johnson would react "to the pressures, in work settings or elsewhere, involved in simple and routine, or repetitive, tasks[,]" Dr. Haglund indicated that Johnson "has low stress tolerance, [is] easily upset and [], impatient, irritable." Tr. 681.

In the Daily Activities Questionnaire, Dr. Haglund noted that Johnson was married but her marriage was seriously strained; her mother and brothers provided support when needed; and she had gotten along fine with former employers, supervisors and coworkers. Tr. 683. When asked to provide examples of anything that might preclude Johnson from performing work activities for a usual workday or workweek, Dr. Haglund answered "Depressed, low motivation and energy, problems concentrating, trouble sleeping. Doesn't want to be around people." Tr. 683. Dr. Haglund indicated that Johnson was capable of caring for her own needs, e.g., food preparation, household chores, hygiene, shopping, driving/using public transportation. Tr. 683. She had no hobbies. Tr. 683.

_March 2011_

On March 28, 2011, Dr. Haglund completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment. Tr. 756-757. He indicated that Johnson was diagnosed with depressive disorder, NOS. Tr. 757. The rating choices for rating Johnson's functional abilities were "less than moderate," "moderate," "marked" or "extreme." Tr. 756-757.

Dr. Haglund opined that Johnson was less than moderately limited in her ability to remember, understand, and follow simple directions; she was moderately limited in her ability to perform work activities at a reasonable pace, keep a regular work schedule and maintain punctual attendance, interact appropriately with others, and make judgments that are

commensurate with the functions of unskilled work, i.e., make simple work-related decisions; and she was markedly limited in her ability to maintain attention and concentration for two-hour periods of time and in her ability to withstand the stresses and pressures of routine simple unskilled work. Tr. 756-757. With respect to the marked limitation in ability to maintain attention and concentration for two-hour periods of time, Dr. Haglund explained that Johnson was "hampered by depression, anxiety, irritability, impaired concentration and memory." Tr. 756. With respect to the marked limitation in ability to withstand the stresses and pressures of routine simple unskilled work, Dr. Haglund explained that Johnson was "easily frustrated – ability to deal with stress and frustration is limited because of depression." Tr. 757. When asked whether he had any other comments regarding whether Johnson's mental limitations would allow her to successfully work at a routine, simple, unskilled job, Dr. Haglund stated "No, other than to say that her mood disorder makes it difficult for her to deal with the usual give-and-take of the work setting." Tr. 757.

### *July 2012*

On July 17, 2012, Dr. Haglund completed another Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment. Tr. 848-849. He again indicated that Johnson was diagnosed with depressive disorder, NOS. Tr. 849. The rating choices for rating Johnson's functional abilities were the same as in the prior Medical Source Statement, i.e., "less than moderate," "moderate," "marked" or "extreme." Tr. 848-849. Dr. Haglund opined that Johnson was less than moderately limited in the her ability to remember, understand, and follow simple directions and less than moderately limited in her ability to make judgments that are commensurate with the functions of unskilled work, i.e., make simple work-related

decisions.[2]  Tr. 848, 849.  He opined that she was moderately limited in her ability to perform work activities at a reasonable pace and keep a regular work schedule and maintain punctual attendance.  Tr. 848.  Dr. Haglund opined that she was markedly limited in her ability to maintain attention and concentration for two-hour periods of time, interact appropriately with others,[3] and withstand the stresses and pressures of routine simple unskilled work.  Tr. 848-849.  With respect to the marked limitation in ability to maintain attention and concentration for two-hour periods of time, Dr. Haglund explained that Johnson's "depression causes anxiety, irritability, impaired concentration and memory."  Tr. 848.  With respect to the marked limitation in ability to interact appropriately with others, Dr. Haglund explained that Johnson "does not want to deal with people."  Tr. 848.  With respect to the marked limitation in ability to withstand the stresses and pressures of routine simple unskilled work, Dr. Haglund explained that Johnson had "low frustration/stress tolerance."  Tr. 849.  When asked whether he had any other comments regarding whether Johnson's mental limitations would allow her to successfully work at a routine, simple, unskilled job, Dr. Haglund stated "At our last session on 5-15-12, [Johnson] said she felt like she was in a fog, felt down on herself and was spending time mostly by herself at home."  Tr. 849.

### b.  Consultative examiner

On September 27, 2010, consultative examining psychologist Thomas F. Zeck, Ph.D., conducted a consultative evaluation.  Tr. 615-619.  Johnson relayed she was depressed all the time.  Tr. 617.  She had a poor marriage and was not happy with her life and situation.  Tr. 617.

---

[2] In the March 2011 medical source statement, Dr. Haglund had rated Johnson's ability to make judgments that are commensurate with the functions of unskilled work, i.e., make simple work-related decisions, as moderate rather than less than moderate.  Tr. 756.

[3] In the March 2011 medical source statement, Dr. Haglund had rated Johnson's ability to interact with others as moderately, rather than markedly, limited.  Tr. 756.

She indicated she was helpless but not hopeless. Tr. 617. She reported crying spells all the time. Tr. 617. Johnson had marital problems and had had a significant weight gain. Tr. 618. She had sleep apnea but no money for a machine. Tr. 617. Dr. Zeck found that Johnson was in the low average range in terms of concentration, rote memory and immediate recall. Tr. 617. Her insight and judgment were in the low average range. Tr. 617. Johnson was stressed because of lack of income and employment. Tr. 618.

Dr. Zeck diagnosed major depressive disorder. Tr. 618. He opined that Johnson's ability to relate to others was moderately impaired due to her depression, irritability and attitude, noting that she felt overly stressed because of her situation and exhibited a very flat affect and depressed mood during the evaluation. Tr. 618. Dr. Zeck opined that Johnson's ability to understand, remember and follow instructions appeared to be moderately impaired due to her depression. Tr. 618. He opined that Johnson's ability to maintain attention, concentration, persistence and pace to perform simple, repetitive tasks did not appear to be impaired, indicating that no problems with attention or concentration were noted. Tr. 619. Dr. Zeck opined that Johnson's ability to withstand the stress and pressures of day-to-day work activity appeared to be moderately impaired primarily due to her depression and the stress that she was feeling. Tr. 619.

### c. Reviewing psychologists

On October 7, 2010, state agency reviewing psychologist Tonnie Hoyle, PsyD., completed a Mental RFC Assessment (Tr. 623-626) and a Psychiatric Review Technique ("PRT") (Tr. 627-640). Dr. Hoyle found that there was insufficient evidence in the file for the period May 15, 2007, through February 10, 2010. Tr. 639. For the period February 11, 2010, through Dr. Hoyle's determination, Dr. Hoyle found that Johnson had mild restrictions in activities of daily living, moderate restrictions in maintaining social functioning and in

maintaining concentration, persistence or pace, and no episodes of decompensation of an extended duration. Tr. 637. In assessing Johnson's mental RFC, Dr. Hoyle considered and gave weight to Dr. Zeck's conclusions and found Johnson's statement mostly credible, noting, however, that factors other than Johnson's psychological allegations played a greater role than Johnson acknowledged in her not working. Tr. 625. Dr. Hoyle opined that Johnson had the RFC to perform repetitive tasks in an environment that would be relatively static and required only brief superficial contact with others. Tr. 625.

Upon reconsideration, on February 17, 2011, state agency reviewing psychologist Vicki Warren, Ph.D., reviewed the file, including Dr. Haglund's February 2011 statement. Tr. 723. Dr. Warren found that Dr. Haglund's statement appeared consistent with the evidence in the file, noting that Johnson's medically determinable impairments could reasonably be expected to result in the alleged symptoms but the intensity of those symptoms was not consistent with the totality of the evidence. Tr. 723. Dr. Warren affirmed the PRT and mental RFC assessment as written by Dr. Hoyle on October 7, 2010. Tr. 723.

## C.    Medical evidence – physical impairments

### 1.    Treatment history

A February 15, 2013, lumbar spine MRI showed advanced discogenic degenerative disc disease and disc bulging at L5-S1. Tr. 926-927. During a December 30, 2013, follow-up visit for her diabetes and hyperlipidemia, Johnson did not complain of back pain and a musculoskeletal physical examination showed edema but normal range of motion. Tr. 1030. On January 28, 2015, Johnson was seen at the emergency room following a fall. Tr. 1049. She reported ankle and right shoulder pain from the fall. Tr. 1049. She denied back pain. Tr. 1049. A musculoskeletal examination showed normal strength and muscle tone with some tenderness

in the right shoulder. Tr. 1050. During a May 6, 2015, consultation regarding a colonoscopy, Johnson denied back pain. Tr. 1061. At that visit, Johnson walked with a normal gait. Tr. 1062.

### 2. Opinion evidence

#### a. Consultative examiner

On July 16, 2010, Mehdi Saghafi, M.D., completed a consultative evaluation. Tr. 607-613. Johnson was 5 feet, 7 inches tall and weighed 290 pounds. Tr. 607. The physical examination was generally normal, with some limitations noted due to lower back pain. Tr. 608. Dr. Saghafi diagnosed anxiety-depression, per history, and status post total thyroidectomy, per history, and opined that:

> Based on the history and objective physical findings, she is able to sit, stand and walk 6-8 hours per day. She does not need ambulatory aid. She is able to lift and carry 30-40 pounds of weight on a frequent basis and lift and carry 41-70 pounds of weight on occasions. She is able to push and pull objects. She is able to manipulate objects. She is able to operate hand and foot controlled devices. She is able to drive a motor vehicle and travel. She is able to climb stairs. Speech, hearing, memory, orientation, and attention are within normal range.

Tr. 609.

#### b. Reviewing physicians

On July 30, 2010, state agency reviewing physician Dimitri Teague, M.D., completed a review of the file and concluded that the evidence in the filed indicate that Johnson's "physical conditions [were] not so severe as to prevent most basic work like activities." Tr. 614. Thus, Dr. Teague concluded that there were no severe physical impairments. Tr. 614.

Upon reconsideration, on February 25, 2011, state agency reviewing physician William Bolz, M.D., reviewed the file and affirmed Dr. Teague's July 30, 2010, opinion as written. Tr. 724.

**D.   Testimonial evidence**

**1.   Plaintiff's testimony**

Johnson was represented and testified at the November 2016 hearing.[4]  Tr. 145-161.

Johnson lives alone.  Tr.  150.  She has a hard time keeping her apartment clean because she is

depressed and her medication makes her nauseous and causes cramping.  Tr. 150-151, 154, 157.

There have been times when Johnson wants to stop taking her medication because of the side

effects but she realizes that she needs to take it.  Tr. 161.  Johnson does her laundry but it tends

to pile up.  Tr. 151, 154.  As far as personal hygiene, Johnson does not always have the right

supplies and she covers her hair a lot with scarves or bandanas because it is out of control.  Tr.

154-155.  Johnson watches television but does not really focus on what the programming is

about and is always sleeping.  Tr. 153, 155.  She does word searches but does not usually get far

with them because she loses focus.  Tr. 153, 155.

Johnson has problems getting along with other people and has attended some anger

management classes.  Tr. 155-157.  Johnson tends to get into arguments mostly with family.  Tr.

156-157.  However, one time, a few years prior, she slapped a neighbor.  Tr. 156.  She does

spend time with one of her mother's friends, Phyllis.  Tr. 155-156.  Phyllis helps Johnson if she

has to go somewhere and will offer her small jobs/chores so Johnson can earn money to cover

minor expenses that she might have.  Tr. 156, 158-159.  Johnson's brother will take her to the

---

[4] As indicated above, hearings were conducted prior to the November 2016 hearing as well.  Tr. 12-74, 75-91, 92-140.  Johnson did not have her identification with her on May 7, 2014, so she was not present at the hearing.  Tr. 77. She was present and testified at the other hearings.  Tr. 18, 96.

grocery store since she does not have a driver's license[5] or a car.  Tr. 151.  Johnson would be able to use public transportation but she does not have the money to pay for it.  Tr. 152-153.

Johnson has sciatic pain that acts up causing her pain in her hip/back.  Tr. 157.  The pain requires one or two emergency room visits per year.  Tr. 157.  The pain causes her to limp if she is walking on grocery store or hospital floors.  Tr. 157.  Due to the sciatic pain, Johnson can usually walk around a store for only 15 minutes or stand for only 15 minutes before she needs to rest on a buggy or sit down and rest.  Tr. 158.

Johnson served as payee for her disabled brother because her mother developed Alzheimer's and was no longer able to serve as payee for Johnson's brother.  Tr. 159-160.  Serving as payee for her brother involves cashing his check for him and taking the rent money out that he needs and giving him the remaining amount.  Tr. 160.

## 2.    Vocational Expert

Vocational Expert ("VE") Hermona Robinson testified at the hearing.  Tr. 162-170.  The VE indicated that Johnson's past relevant work as a dialysis technician was a light, skilled job.  Tr. 164.

The ALJ asked the VE to consider an individual of Johnson's age, education and past relevant work experience who has no exertional limitations; has the capacity to perform repetitive tasks in an environment that is relatively static; and who has the capacity for occasional and superficial contact with others and the ability to remember, understand and follow directions to perform simple, repetitive tasks.  Tr. 164-165.  The VE indicated that the described individual would be unable to perform Johnson's past relevant work but there would be other jobs that the individual could perform, including (1) garment sorter, a light, unskilled job; (2)

---

[5] Johnson lost her driver's license while she was living in Georgia for not paying a ticket.  Tr. 151-152.

laundry worker, a light, unskilled job; and (3) laundry worker, a medium, unskilled job.  Tr. 165-166.

For her next hypothetical, the ALJ asked the VE to consider an individual of Johnson's age, education and past relevant work experience who has the residual functional capacity for light work with the capacity to perform repetitive tasks in an environment that is relatively static; only occasional and superficial contact with others; has the capacity to remember, understand and follow directions to perform simple repetitive tasks; could never climb ladders, ropes and scaffolds; could occasionally stoop; and would have to avoid concentrated exposure to hazards such as industrial machinery and unprotected heights.  Tr. 166.   The VE indicated that the previously identified light, unskilled jobs of garment sorter and laundry worker would remain available to the described individual and the job of marker, a light, unskilled job would also be available.  Tr. 166-167.

Johnson's counsel asked the VE to consider an individual with the following mental limitations – marked limitations (meaning can perform the activity in an appropriate manner between occasionally and frequently or between one-third up to two-thirds of the time) in maintaining attention and concentration for two-hour time periods and in withstanding the stress and pressure of routine, simple, unskilled work; and moderate limitations (meaning can perform the activity in an appropriate manner at least frequently, but not constantly, or more than two-thirds of the time up to constantly, but not constantly) in performing work activities at a reasonable pace; keeping a regular work schedule and maintaining attendance; interacting appropriately with others; and making judgments that are commensurate with the functions of unskilled work.  Tr. 168-169.  The VE indicated that the described individual would be unable to perform competitive employment, primarily because of the marked limitations, but also in

combination with the various moderate limitations.  Tr. 169.  In response to a follow-up hypothetical, the VE indicated that, if there were only marked limitations in the areas of maintaining attention and concentration for two-hour periods; interacting appropriately with others; and withstanding the stress and pressure of routine, simple, unskilled work, there would be no work available.  Tr. 169.  In response to questions regarding thresholds for being off task, the VE indicated that being off task even 10% of the time would be work preclusive.  Tr. 169-170.  Also, the VE indicated that, if an individual was absent even one day per month on an ongoing basis, it would be work preclusive.  Tr. 170.  The VE agreed that marked limitations in withstanding the stress and pressures of routine, simple, unskilled work would be consistent with someone who would be missing work at least one day per month.  Tr. 170.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[6] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[6] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[7] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[8] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

---

[7] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[8] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

# IV. The ALJ's Decision

In her December 29, 2016, decision, the ALJ made the following findings:[9]

1.    Johnson meets the insured status requirements of the Social Security Act through September 30, 2012. Tr. 1217.

2.    Johnson has not engaged in substantial gainful activity since May 15, 2007, the alleged onset date. Tr. 1217.

3.    Johnson has the following severe impairments: obesity and discogenic and degenerative disc disease as of August 15, 2012; and affective disorder as of February 11, 2010. Tr. 1217-1218. Johnson also has various non-severe impairments. Tr. 1217-1218.

4.    Johnson does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 1218-1221.

5.    From May 15, 2007, through February 10, 2010, the record was insufficient to establish a functional capacity. Tr. 1221-1225. From February 11, 2010, through August 14, 2012, Johnson had the RFC to perform repetitive tasks in an environment that is relatively static and requires only occasional and superficial contact with others. Tr. 1221-1225. From August 15, 2012, through the present, Johnson can do light work as defined in 20 C.F.R. § 404.1567(c) except she can perform repetitive tasks in an environment that is relatively static and requires only occasional and superficial contact with others.[10] Tr. 1221-1225.

6.    Johnson has been unable to perform any past relevant work since February 11, 2010. Tr. 1225.

7.    Johnson was born in 1963 and was 43 years old, defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 1225. Johnson subsequently changed age category to closely approaching advanced age. Tr. 1225-1226.

---

[9] The ALJ's findings are summarized.

[10] The Court notes that the RFC as ultimately determined by the ALJ and set forth in the decision is not as restrictive as the hypotheticals posed to the VE. *See* Tr. 164-166. For example, the first VE hypothetical included a limitation of "capacity to remember, understand and follow directions to perform simple, repetitive tasks." Tr. 165. And, the second hypothetical, included that limitation as well as some additional postural and environmental limitations, e.g., limitations on climbing ladders, ropes, and scaffolds, etc. Tr. 166. In her opening brief, Johnson indicates that the VE "was asked to assume a person of Ms. Johnson's age, education, and work experience who was limited in the manner ultimately found by the administrative law judge." Doc. 16, p. 4. Considering this statement, Johnson has waived any argument pertaining to differences between the RFC as ultimately determined by the ALJ and set forth in the decision and the hypotheticals posed to the VE.

8.      Johnson has at least a high school education and is able to communicate in English.  Tr. 1226.

9.      Transferability of job skills is not material to the determination of disability.  Tr. 1226.

10.     For the period of February 11, 2010, through August 14, 2012, considering Johnson's age, education, work experience, and RFC, there are jobs that existed in significant numbers in the national economy that Johnson could perform, including garment sorter, laundry worker (light), and laundry worker (medium).  Tr. 1226-1227.  As of August 15, 2012, considering Johnson's age, education, work experience, and RFC, there are jobs that existed in significant numbers in the national economy that Johnson could perform, including garment sorter, laundry worker (light), and marker.  Tr. 1226-1227

Based on the foregoing, the ALJ determined Johnson had not been under a disability, as defined in the Social Security Act, from May 15, 2007, through the date of the decision.  Tr. 1227.

## V. Plaintiff's Arguments

First, Johnson argues that the ALJ erred in weighing the medical opinion evidence.  Doc. 16, pp. 13-21, Doc. 19, pp. 1-3.  Johnson contends that the ALJ erred by failing to provide good reasons for the weight she assigned to the opinions of her treating psychologist Dr. Haglund and by failing to mention the opinion of the consultative examining psychologist Dr. Zeck.  *Id.*

Second, Johnson argues that the RFC is not supported by substantial evidence because the ALJ failed to identify RFC limitations pertaining to concentration, persistence or pace even though the ALJ found moderate limitations in concentration, persistence and pace.  Doc. 16, pp. 21-22, Doc. 19, p.3.

Third, Johnson argues that the ALJ failed to fully consider the effects of her extreme obesity on her ability to perform the physical demands of work.  Doc. 16, pp. 22-23, Doc. 19, pp. 3-5.

**VI. Law & Analysis**

**A.      Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      Johnson has not demonstrated reversible error based on the ALJ's weighing of the medical opinion evidence**

Johnson argues that the ALJ erred by failing to provide good reasons for the weight assigned to the opinion of her treating psychiatrist Dr. Haglund and by failing to mention the opinion of consultative examining psychologist Dr. Zeck.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c). The ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding[ ] [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id*

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c). An ALJ is not

obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011). Non-treating physicians are not entitled to deference or controlling weight under the treating physician rule. *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).

### Dr. Haglund

As discussed previously, Dr. Haglund rendered three opinions regarding Johnson's mental impairments. Tr. 680-684 (February 2011), 756-757 (March 2011), 848-849 (July 2012). The ALJ considered and weighed those opinions, explaining:

> The undersigned gives little weight to the mental functional capacity assessments by treating psychologist, Thomas Hagland, Ph.D. dated February 9, 2011, March 28, 2011, and July 17, 2012 (Exs. 9F, 13F, 20F). He noted the claimant was diagnosed with a depressive disorder. Although, Dr. Hagland suggested marked limitations in attention, concentration, and the ability to withstand the stresses and pressures of routine, simple, unskilled work in his March 2011 report, and reported marked difficulties in interacting with others in his July 2012 statement, he generally found less than moderate or moderate problems in most areas. However, he found few problems when assessing the claimant's abilities in his February 2011 statement, which directly contradicted his other assessments. In his treatment notes, Dr. Hagland cited the claimant's unfortunate marriage and lack of finances as situational triggers for her depression (Ex. 9F), while in February 2012, the claimant noted no current problems and Dr. Hagland believed she was making good progress (Ex. 16F). He further reported that the claimant's problems were resolving in July 2012, following her divorce (Ex. 20F). For these reason, the undersigned cannot give controlling or great weight to Dr. Hagland's opinions.

Tr. 1224-1225.

Consistent with the Regulations, the ALJ explained her reasons for providing Dr. Haglund's opinions less than controlling or great weight. Johnson argues that the reasons are not good reasons. She contends that the ALJ's statement that Dr. Haglund found few problems when assessing Johnson's abilities in February 2011 as compared to the later opinions is not accurate. First, the Court observes that it is not for this Court to try the case *de novo* or resolve

conflicts in evidence. *See Garner*, 745 F.2d at 387 (Aa court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."). Second, the ALJ's findings are not unsupported by the record. For instance, in his February 2011 opinion, Dr. Haglund opined in vague terms that Johnson's ability to remember, understand, follow directions and maintain attention were "probably" intact and her ability to sustain concentration, persist at tasks and complete them in a timely fashion "may" be impaired (Tr. 681) whereas a month later Dr. Haglund found much greater limitations, i.e., marked, in the area of maintaining attention and concentration (Tr. 756). While the symptoms noted by Dr. Hagland in the February 2011 opinion and later opinions may have been similar, his assessment of the effect of those symptoms on Johnson's functional abilities differed and Johnson has not shown that it was error for the ALJ to rely on those differences as a basis upon which to discount the weight attributed to Dr. Haglund's opinions. Also, as noted by the ALJ, Johnson's medical treatment records show various situational triggers which exacerbated Johnson's condition at time but other indications that Johnson was doing better and making progress. Thus, it was not error for the ALJ to find Dr. Haglund's marked limitations not consistent with or supported by the record. Further, Johnson's claim that the ALJ ignored or failed to acknowledge records in which Dr. Haglund observed depressive symptoms, low motivation, isolation and irritability is unfounded. Those symptoms were identified by Dr. Haglund in his opinions and considered by the ALJ. While Johnson disagrees with the ALJ's weighing of Dr. Haglund's opinions, she has not shown that those reasons are unsupported by substantial evidence. Accordingly, the Court rejects Johnson's claim that the ALJ erred in weighing the opinions of Dr. Haglund.

*Dr. Zeck*

Johnson seeks reversal of the Commissioner's decision based on the ALJ's failure to mention the opinion of Dr. Zeck. As a consultative examiner, Dr. Zeck's opinion is not entitled to treating source deference. Also, although the ALJ did not specifically mention Dr. Zeck's opinion, the ALJ cited to the opinion. Tr. 1218 (citing Exhibit 4F, Tr. 615-619, when discussing impairments at Step Two), Tr. 1223 (citing Exhibit 4F, when discussing Johnson's work history). Additionally, Dr. Hoyle discussed in detail and weighed Dr. Zeck's opinion when completing her mental RFC assessment (Tr. 625) and the ALJ considered and weighed Dr. Hoyle's opinion (Tr. 1224). Thus, it cannot be said that the ALJ was unaware of or ignored the Dr. Zeck's opinion. Moreover, "[t]he Sixth Circuit has previously found that the failure to explicitly discuss the opinion of a consultative, non-treating source was harmless error where the ALJ's decision was otherwise supported by substantial evidence." *Wright v. Astrue*, 2009 WL 1471279, * 3 (E.D. Tenn. Mar. 27, 2009) (citing *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 839 (6th Cir. 2005) and *Dykes v. Barnhart*, 112 Fed. Appx. 463, 467-469 (Oct. 12, 2004)). As explained herein, the ALJ's decision is supported by substantial evidence and Johnson has not shown that the ALJ's failure to specifically mention Dr. Zeck's opinion, which included no more than moderate impairments in any category and no impairment in Johnson's ability to maintain attention, concentration, persistence and pace, warrants a finding of reversible error.

**C.** **Johnson has not shown that the RFC is not supported by substantial evidence because of a failure to include additional limitations to account for impairments in concentration, persistence or pace or because of the failure of the ALJ to fully consider the effects of Johnson's obesity**

*Concentration, persistence or pace argument*

Johnson argues that, because the ALJ concluded at Step Three of the sequential analysis, that Johnson had moderate difficulties in concentration, persistence or pace, the ALJ erred by not including additional mental limitations in the RFC. Relying on *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), she also contends that limiting Johnson to repetitive tasks in an environment that is relatively static was insufficient to account for problems in concentration or persistence.

In *Ealy*, the ALJ relied upon a physician's assessment that included speed and pace based restrictions. 594 F.3d at 516. However, the ALJ did not rely on a vocational expert hypothetical containing a fair summary of those speed and pace based restrictions. *Id.* Instead, the ALJ's hypothetical only limited the claimant to simple, repetitive tasks and instructions. *Id.* The Sixth Circuit concluded that the hypothetical did not adequately describe the claimant's limitations and, as a result, the vocational expert's testimony did not constitute substantial evidence in support of the ALJ's Step Five determination. *Id.* at 516-517. *Ealy*, however, does not establish a bright-line rule for how ALJs must account for limitations in concentration, persistence or pace. *See Jackson v. Comm'r of Soc. Sec.*, 2011 WL 4943966, *4 (N.D. Ohio Oct. 18, 2011) (finding that "*Ealy* stands for a limited, fact-based, ruling in which the claimant's particular moderate limitations required additional speed - and pace-based restrictions").

Here, in assessing the severity of Johnson's mental impairment at Step Three the ALJ evaluated Johnson's impairment using the "paragraph B" criteria. Tr. 1220-1221. The ALJ

found moderate limitations in concentration, persistence or pace at Step Three but also found that Johnson did not need reminders to go places, did okay following written and spoken instructions, could count change, pay bills and handle a savings account. Tr. 1220. Also, Johnson testified her concentration was "fair." Tr. 1220. Moreover, as indicated in the decision, limitations identified in the "paragraph B" criteria are not an RFC assessment. Tr. 1221. Thus, as part of his RFC analysis, the ALJ properly did not simply adopt his Step Three finding regarding concentration, persistence or pace. *See* SSR 96-8p, 1996 WL 374184, * 4 (Jul 2, 1996) ("[T]he limitations identified in the 'paragraph B' . . . criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." ). Rather, the ALJ discussed Johnson's medical treatment and opinion evidence and determined that mentally Johnson had the RFC to perform repetitive tasks in an environment that is relatively static and requires only occasional and superficial contact with others. Tr. 1221. Johnson has not shown that these limitations are not supported by substantial evidence. For example, the limitations are supported by the opinions of Dr. Hoyle and Dr. Warren, state agency reviewing psychologists, whose opinions the ALJ assigned some weight to. Tr. 625, 723, 1224. Additionally, she has failed to identify what additional limitations should have been included to account for her limitations in concentration, persistence or pace.

Based on the foregoing, the Court finds that Johnson has not shown that the mental RFC is unsupported by substantial evidence or that reversal and remand is warranted.

### *Obesity argument*

Johnson contends that the physical RFC is unsupported by any medical source and is not adequately explained because the ALJ did not fully consider the effect of Johnson's obesity on her ability to perform the physical demands of work. Beginning on April 15, 2012, through the

date of the decision, the ALJ found that Johnson had severe physical impairments of obesity and discogenic degenerative disc disease (Tr. 1217) and limited Johnson to light work as of April 15, 2012 (Tr. 1221). Johnson contends that her impairments limit her to no more than sedentary work.

Johnson suggests that the ALJ did not properly consider her obesity because there was no statement as to her body mass index ("BMI"). However, she fails to identify any legal authority requiring an ALJ to specify a claimant's BMI. In fact, while SSR 02-1p, *Evaluation of Obesity*, 2002 WL 34686281 (Sept. 12, 2002), provides that obesity will be considered by an ALJ in assessing a claimant's disability claim, SSR 02-1p does not establish a particular formula or method for evaluating obesity at each of the sequential steps in the evaluation process. *See Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411-412 (6th Cir. 2006) ("Social Security Ruling 02-01p does not mandate a particular mode of analysis."); *see also Nejat v. Comm'r of Soc. Sec.*, 359 Fed. Appx. 574, 577 (6th Cir. 2009) ("'Social Security Ruling 02-01p does not mandate a particular mode of analysis,' but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation.") (quoting and relying on *Bledsoe*, 165 Fed. Appx. at 411-412). Additionally, although the ALJ did not specify Johnson's BMI, the ALJ concluded that, as of April 15, 2012, one of Johnson's severe impairments was obesity (Tr. 1217) and, when discussing whether Johnson's impairments met or equaled a listing, the ALJ noted her height (five feet, six inches) and weight (287 pounds) as of October 31, 2013,[11] and noted that the records reflected that Johnson's weight was increasing steadily (Tr. 850, 1219). The October 31, 2013, medical record reflects Johnson's height and weight as well as her BMI, which was 46.35. Tr. 850.

---

[11] The ALJ also referenced a June 23, 2016, medical record which reflected that Johnson was five feet, six inches tall and weighed 272 pounds. Tr. 1182, 1219.

The ALJ considered Johnson's obesity in combination with her other impairments when assessing whether her impairments met or equaled a listing. Tr. 1218-1221. In making this assessment, the ALJ observed that Johnson did not require the use of ambulatory aids and there was no significant disorganization of motor function into her extremities and no muscle weakness or atrophy. Tr. 1219. Also, the ALJ found only mild restrictions in Johnson's activities of daily living. Tr. 1220. Additionally, when assessing Johnson's RFC, the ALJ considered Johnson's musculoskeletal problems and obesity. Tr. 1222 ("In terms of the claimant's alleged musculoskeletal problems and obesity . . ."). In doing so, the ALJ noted that Johnson's treatment had been sporadic and conservative (Tr. 1222); there was no evidence of range of motion limitations during a December 2013 physical examination (Tr. 1030, 1222); and in January 2015, Johnson had full muscle strength in all extremities (Tr. 1050, 1222). Also, as noted by the ALJ, Johnson denied back pain May 2015. Tr. 1061, 1222. When assessing Johnson's RFC, the ALJ also noted that Johnson served as a caretaker for her ailing mother. Tr. 972, 1223. Considering these records, Johnson has not shown that her physical impairments, including her obesity, necessitated a more restrictive RFC than assessed by the ALJ.

Johnson also contends that, since there are no physical medical assessments after April 15, 2012, it is unclear upon what basis the ALJ concluded that Johnson was capable of light work. Notwithstanding this contention, Johnson acknowledges that the ALJ referenced Johnson's daily activities. She argues, however, that her daily activities are not inconsistent with her allegation that she should be limited to no more than sedentary work. This argument amounts to a request that the Court consider the matter *de novo* or resolve conflicts in evidence. However, as indicated above, that is not the role of this Court. Here, Johnson has failed to demonstrate that the ALJ did not properly consider her obesity when evaluating whether her

impairments met or equaled a listing and/or in assessing her RFC. Further, Johnson has not shown that the RFC is not supported by substantial evidence. Johnson's disagreement with the ALJ's ultimate determination that Johnson had the RFC to perform light, as opposed to sedentary, work is not a basis for reversal or remand when the ALJ did not err with respect to her consideration of Johnson's obesity.

Additionally, Johnson has not shown that the lack of more current medical opinion evidence is a basis for reversal. While the opinion of consultative examiner Dr. Saghafi is dated July 16, 2010, Johnson weighed 290 pounds (Tr. 607) at the time of his evaluation, which is approximately the same weight she was after April 15, 2012 (Tr. 850 (October 31, 2013, office visit – weight 287 pounds)). Based on Johnson's history and objective physical findings, Dr. Saghafi concluded that Johnson had the capacity for more than sedentary level work. Tr. 609. The ALJ gave significant weight to Dr. Saghafi's opinion, noting that the evaluation was made six years prior but finding his assessment of Johnson's ability to sit, stand and walk was generally consistent with the RFC in Johnson's case. Tr. 1224. Furthermore, as indicated above, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c). The ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."); *Rudd v. Comm'r of Soc. Sec.*, 531 Fed. Appx. 719, 728 (6th Cir. 2013) (""[T]he Commissioner has final responsibility for deciding an individual's RFC . . . [and] the ALJ was not required to base her determination on a medical opinion[.]").

Based on the foregoing, the Court finds that Johnson has not shown that the ALJ erred in considering her obesity.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: August 14, 2018                     */s/ Kathleen B. Burke*
                                           Kathleen B. Burke
                                           United States Magistrate Judge